NOT DESIGNATED FOR PUBLICATION

No. 112,947

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

PHILIP J. WOLTERS,
*Appellant*,

v.

CITY OF ST. FRANCIS

and

KANSAS MUNICIPAL INSURANCE TRUST,
*Appellees*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed February 12, 2016. Affirmed.

*Shirla R. McQueen*, of Sharp McQueen, P.A., of Liberal, for appellant.

*William L. Townsely* and *Lyndon W. Vix*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellees.

Before BRUNS, P.J., MCANANY, J., and JOHNSON, S.J.

*Per Curiam*:  Philip J. Wolters appeals the decision of the Workers Compensation Board (Board) modifying the award entered by the Administrative Law Judge (ALJ). In the present appeal, Wolters contends that the Board's decision was based on errors of law and on factual findings that were not supported by substantial competent evidence. Because we find no legal error and find that there is substantial evidence in the record on appeal to support the Board's findings of fact, we affirm.

1

Wolters began working as a police officer for the City of St. Francis on December 27, 2007. In the early morning hours of February 2, 2008, Wolters—while acting in the scope of his employment—went to check pump gages at the city water plant. Unfortunately, as Wolters was exiting the building after checking the gages, he slipped and fell on ice that had accumulated on the sidewalk. When he fell, Wolters twisted his right ankle and landed on his hands and knees. Because it was near the end of Wolters' shift, he went to back to his office, turned in his activity log sheets, and went home.

When Wolters woke up later that morning, his right ankle was swollen. Moreover, he had streaks from his ankle to his toes. He called the Police Chief Deb Farland, and she took him to the Cheyenne County Clinic. At the clinic, Wolters saw a physician assistant, Tyler Raile, and had x-rays taken of his right ankle. In addition, a splint was placed on his ankle. According to Wolters, Raile asked him what his most debilitating injury was and he told him that it was his right ankle. Raile's notes, however, do not mention that Wolters made any other complaints. Specifically, there is no mention of a left knee injury. Subsequently, during the workers compensation proceeding, Raile would testify that he did not restrict Wolters from reporting all of his complaints, and—if Wolters had made him aware of other injuries—Raile would have recorded them in his notes.

On February 3, 2008, Wolters completed an employer's report of accident. In the report, Wolters stated that he twisted his ankle and fell on ice at 2:16 a.m. In the section of the report asking him to describe in detail the nature and extent of his injury and the part of body involved, Wolters wrote "'sprain to ankle.'" Later, during the workers compensation proceedings, Wolters would testify that he listed his ankle as his only injury upon Chief Farland's suggestion that he do so.

As a result of the slip and fall, Wolters was off work for 3 days. According to Wolters, he was told there was no option for light duty and that he needed to return to work. About a week after the fall, Wolters was given a release to go back to full duty. Although Wolters' right ankle continued to be painful, he continued performing his usual job duties.

At some point that is unclear from the record, Wolters' left knee began hurting. He evidently told Chief Farland about the pain. According to Wolters, Chief Farland once again told him that there was no light duty and that he would have to keep working in order to be paid.

Although there is no record of the appointment, Wolters claims that he saw Dr. Mary Beth Miller at the Cheyenne County Clinic for blood pressure and neck pain issues in March 2008. Furthermore, Wolters claims that he mentioned to Dr. Miller that he had left knee pain and was advised to take ibuprofen.

There is a record of Wolters' visit to Dr. Miller on October 3, 2008, for issues with his left knee. Dr. Miller would subsequently testify in the workers compensation proceedings that this was the first time she saw Wolters as a patient. According to her notes, Dr. Miller saw Wolters for a blood pressure check, for a cough as well as for ankle, knee, neck, and back pain. Specifically, Dr. Miller's records indicate that Wolters reported that he twisted his right ankle in February 2008 and that he had had a cough for 6 months. In addition, her notes reflect that he stated that his left knee had been giving him trouble for the previous 3 weeks. In particular, he said that his left knee was popping and that it was difficult for him to go up and down stairs. Although she saw that he had full range of motion with extension and flexion, no gross edema or evidence of acute injury, and no pain upon palpitation, Dr. Miller referred Wolters to Dr. Mekki M. Saba, an orthopedic surgeon in Colby.

3

Wolters saw Dr. Saba on October 6, 2008. Notes from Dr. Saba's consultation reflect:

> "'The patient stated to me after he had the initial injury in February and had treatment for the right ankle with the brace, he did not feel any problem with the left knee. He continued to work with the left knee until 6-08 and he felt pain on the outer side of the left knee on bending the knee, especially on going up and down the stairs.
>
> . . . .
>
> "'Second, he developed pain on the outer aspect of the left knee in June which is almost five months after the initial injury. It could well be related to the original injury. Clinically, we suspect there is a tear of the anterior horn of the latera[l] meniscus.'"

In June 2009, Wolters evidently saw Dr. Daniel Pflieger in Greeley, Colorado, because his knee "went out" while he was at work. On July 20, 2009, Wolters saw Dr. Miller again because he had reinjured his right ankle. Dr. Miller's notes do not mention Wolters' left knee or back on that visit. However, she saw him for left knee and right ankle pain on August 26, 2009. According to Dr. Miller's notes, Wolters told her that he fell on February 2, 2008, onto both hands and knees and that at the time of his fall, his ankle hurt the most. He stated that his knee started hurting in March 2008. Later, at her deposition in the workers compensation proceedings, Dr. Miller stated it was impossible for her to say whether Wolters' left knee injury occurred during his initial fall or at a different time.

Wolters stated that in September 2009, at the referral of Dr. Pflieger, he evidently saw a Dr. Sanderford, another orthopedic surgeon. Dr. Sanderford reviewed Wolters' MRI and concluded that he had no cartilage in an area of his left knee. According to Wolters, Dr. Sanderford recommended that he take time off work and gave him a Synvisc

injection. Dr. Sanderford also x-rayed Wolters' right ankle, which Wolters stated was still hurting.

In October 2009, Dr. Sanderford performed surgery on Wolters' left knee. Before this surgery, Wolters continued performing his regular job duties, with the exception of the 3 days following the fall in February 2008. He apparently went back to work at some point until he had another surgery to replace his left kneecap and the end of his fibula on August 18, 2010. During this surgery, Wolters underwent a femoral nerve block that ended up damaging his femoral nerve. According to Wolters, the nerve damage caused weakness in his left quadriceps as well as pain in his left leg.

Wolters never returned to work as a police officer after this second surgery. Evidently, he was unable to perform the physical requirements of work and was subsequently terminated. At some point following his second surgery, Wolters also began experiencing back pain that progressively worsened. It appears that he later worked at Cabela's in Nebraska for about 2 months in the summer of 2013. However, due to pain, he voluntarily terminated his employment.

On March 9, 2011, Wolters filed an application for hearing with the division of workers compensation. In the application, he stated that he was injured as a result of a fall in the course of employment. Specifically, he indicated that he suffered injuries to his "left lower extremity, right ankle and low back." On June 6, 2011, Wolters was evaluated at the request of his attorney by Dr. Gareth E. Shemesh in Denver, Colorado. Wolters told Dr. Shemesh that when he fell on February 2, 2008, his right ankle gave out and he landed on his left knee. Wolters stated he had "'immediate onset of pain, swelling, and difficulty using his left knee.'"

Dr. Shemesh opined that Wolters had suffered a twisting/contusion injury to his left knee as a result of the fall, with subsequent development of traumatic degenerative

arthritis of the left knee. Dr. Shemesh gave Wolters a 15% whole person functional impairment rating but did not access any right ankle permanent functional impairment. Dr. Shemesh also opined that within a reasonable degree of medical probability, Wolters' left knee problems developed as a direct result of the fall on February 2, 2008.

On October 11, 2012, Wolters' deposition was taken. At that time, Wolters testified that he still had numbness and loss of strength in his quadriceps as well as sharp pain around his left knee joint. On a scale of 1-10, Wolters described his pain as a constant 3. However, he testified that his pain escalated to a 10 when pressure was placed on his knee. He stated that wearing pants made him feel like he had a sunburn. He also testified that he had pain in both hips and a sharp pain at the belt level of his lower back. In addition, he testified that his right ankle was better but that he still had intermittent pain and weakness.

On September 16, 2011, the ALJ ordered an independent evaluation of Wolters to be performed by Dr. Terrence Pratt. The evaluation was conducted on December 27, 2011. At the evaluation, Wolters told Dr. Pratt that after the slip and fall in February 2008, he had discomfort in his wrists, left knee, and right ankle. He also told Dr. Pratt that he reported all his symptoms to a nurse practitioner but was told to concentrate on the most significant area of involvement, which was in his right ankle. Dr. Pratt opined that Wolters' right ankle and left knee injuries were a direct result of the fall, with the femoral nerve problems being a complication arising from his treatment. According to Dr. Pratt, Wolters had reached maximum medical improvement, had a 37% impairment to the left lower extremity, and had a 15% whole person impairment. Moreover, in a report dated January 11, 2012, Dr. Pratt rendered the opinion that Wolters had "left knee involvement in relationship to the February 2008 event."

On October 12, 2012, an ALJ held a preliminary hearing, at which Wolters testified in support of continued medical treatment. After the preliminary hearing, the

ALJ ordered another independent medical examination to be performed by Dr. Timothy J. Birney. Wolters was evaluated by Dr. Birney on November 12, 2012. In his report, Dr. Birney stated that Wolters had reported to him an immediate onset of right ankle and left knee pain after his fall on February 2, 2008. Further, in Dr. Birney's opinion, Wolters had not yet reached maximum medical improvement. Instead, Dr. Birney believed that additional evaluation was necessary and ordered an MRI.

Dr. Birney saw Wolters again on January 25, 2013. At that time, based on a review of Wolters' MRI, Dr. Birney determined that Wolters had reached maximum medical improvement. Dr. Birney believed that Wolters' chronic low back pain was the result of a gait abnormality caused by a combination of an abnormal painful sensation in the left thigh and ongoing left knee pain. Wolters told Dr. Birney that his low back pain developed after the femoral nerve block. Dr. Birney testified that his opinion was based on the subjective history related to him by Wolters—which included that he injured his left knee on February 2, 2008, and that he had no history of preexisting back pain.

On June 7, 2013, the ALJ ordered another independent medical examination to be conducted by Dr. Pratt. Based on his examination of Wolters on July 30, 2013. Dr. Pratt opined that Wolters should avoid lifting more than 30 pounds as well as avoid pushing and pulling more than 50 pounds. He further opined that Wolters should not perform activities where he had to climb, squat, crawl, or run as well as prolonged standing or walking or frequent bending or twisting.

In his report, Dr. Pratt stated:

> "Permanent partial impairment in relationship to his lumbosacral involvement with current discomfort and limited range of motion, utilizing Fourth Edition of the Guides, he has DRE category II involvement utilizing page 3/102 and 5% impairment of the whole person. There is no significant evidence of lumbosacral radiculopathy.

7

"For his right ankle involvement, he does not have any significant findings with 0% permanency of the whole person. His left lower extremity involvement, knee and peripheral nerve injury continues to result in 15% permanent partial impairment of the whole person.

"Total permanency utilizing the Combined Values Chart 19% of the whole person."

Once again, Dr. Pratt's opinions were based on his understanding that when Wolters fell on February 2, 2008, he had immediate pain in his left knee. In fact, during cross-examination at his deposition, Dr. Pratt recognized that his ability to conclude that the left knee symptoms were related to the fall on February 2, 2008, would be impacted if Wolters had not initially had knee symptoms and had not reported those symptoms having begun until later in 2008. Dr. Pratt noted that his opinion on causation hinged on Wolters' report that he injured his left knee on February 2, 2008. He also stated that his opinions would be affected if Wolters had preexisting low back pain.

Dr. David Ebelke evaluated Wolters on July 29, 2013, at the City's request. Dr. Ebelke is an orthopedic physician who only treats the spine. He noted that Wolters' medical records showed that his first complaint of low back pain was in October 2008 and that Wolters had denied having any prior history of back problems. Dr. Ebelke did not believe that Wolters' low back pain was work related, and he stated that there was no medical evidence of a significant or serious back problem. He determined there was no impairment rating for Wolters' back.

The ALJ held a regular hearing on March 7, 2014, at which Wolters once again testified. At the hearing, the parties stipulated to the admission of medical records from Dr. Pamela Guthrie and Dr. Hans Coester from 1999. The records revealed that Dr. Guthrie saw Wolters on May 4, 1999, for complaints of having low back pain for approximately the past 8 months. At that time, Wolters complained of having periods of

8

severe pain causing him to not be able to straighten up, which lasted 15-30 minutes before resolving. The record further reflected that Wolters had indicated that he had been a bull rider as a youth and had the potential for multiple injuries. The remaining entries on Dr. Guthrie's records and the record from Dr. Coester documented Wolters' complaints of neck pain and problems with his upper spinal discs in July 1999.

On April 23, 2014, the ALJ filed a stipulated order, stating that the parties agreed to extend Wolters' "terminal date" to May 27, 2014, and that they would pay Wolters temporary total disability of $456.25 per week until the terminal date. The parties also stipulated to how much Wolters had been paid in benefits and to how much he was making.

On May 5, 2014, Wolters was evaluated by Dr. David Clymer at the City's request. Wolters told Dr. Clymer that he fell on February 2, 2008, twisted his ankle, and landed on his hands and knees. Moreover, he told Dr. Clymer that he remembered skinning his left knee. According to Dr. Clymer, the history Wolters gave regarding his left knee injury was significantly different that the version contained in Dr. Miller's records or in the records of the physician's assistant who originally treated him. Dr. Clymer opined that Wolters did not have a permanent right ankle impairment or a significant left knee injury resulting from the fall in February 2008. Although Dr. Clymer reviewed an MRI from October 2008 and agreed that there was some patellar tendinitis, he found the rest of the findings to be normal. Specifically, he noted that he saw no bony fractures, meniscus tears, cartilage tears, or ligament injuries. Ultimately, he opined that Wolters had a 25% permanent functional impairment to the left lower extremity, which constituted a 10% whole person functional impairment.

In a decision filed on June 12, 2014, the ALJ determined that Wolters sustained personal injury by accident arising out of and in the course of his employment on February 2, 2008. The ALJ further found that Wolters suffered permanent injury to his

left knee and low back as a result of the fall. Accordingly, the ALJ awarded Wolters 41.98 weeks of temporary total disability compensation followed by 73.72 weeks of permanent partial disability compensation for a 19% permanent partial impairment to the body as a whole and subsequent periods of work disability ending with an 87.5% work disability.

On June 19, 2014, the City and its insurance carrier filed a request for review by the Board. The City filed its appellate brief on August 1, 2014, and Wolters stood on his submission letter to the ALJ. Thereafter, on October 14, 2014, the Board heard oral arguments and issued a comprehensive 14-page order on November 25, 2014.

In its order, the Board considered each of Wolters' claimed injuries to determine whether he met his burden to establish his right to workers compensation. As to his right ankle, the Board affirmed the ALJ's finding that Wolters suffered no permanent right ankle injury. The Board, however, disagreed with the ALJ's finding that Wolters sustained a work-related left knee injury. The Board found the testimony of the physician's assistant who initially treated Wolters to be credible. Moreover, the Board noted that Wolters listed only a right ankle injury on the report of accident.

The Board also noted that Wolters worked every day performing his regular job duties without restrictions until he complained of left knee pain to Dr. Miller on October 3, 2008. Furthermore, it noted that Wolters had stated at that time that his left knee had only been hurting for the last 3 weeks. The Board found that this evidence corroborated the physician assistant's testimony that Wolters did not complain of a left knee injury on his initial visit to the Cheyenne County Clinic following his fall. Moreover, the Board found that Wolters had told Dr. Saba that after his initial injury in February 2008, he was treated for his right ankle injury with a brace and that he did not have problems with his left knee until 4 to 5 months after the accident. The Board also noted that Dr. Clymer found only patellar tendinitis when reviewing Wolters' October 13, 2008, MRI.

10

The Board determined that Dr. Shemesh, Dr. Clymer, and Dr. Pratt all based their opinions on subjective medical histories given by Wolters that were different from the history he had given following the fall in February 2008. In particular, the Board found that Dr. Shemesh based his opinion on Wolters' report that he injured his left knee during his initial fall, including an immediate onset of pain, swelling, and difficulty using his left knee, which was different from Wolters' own testimony about his immediate injuries. The Board also found that Dr. Clymer specifically testified that the history Wolters gave him was different from the version in Dr. Miller's records. And although Dr. Clymer believed that the problems in Wolters' left knee could have been caused by a traumatic injury, he admitted that such problems were usually was caused by wear, tear, and degeneration.

In addition, the Board noted that Dr. Pratt testified that filling out an accident report without mentioning a left knee injury was inconsistent with Wolters' history, and Dr. Pratt's causation opinion hinged entirely on Wolters' report that he injured his left knee on February 2, 2008. Finally, the Board found that the ALJ erroneously relied on photographs showing injury and bruising to Wolters' left knee. The Board noted that only one photograph showed any form of left knee injury—an abrasion—and it was not relevant because it was taken on February 13, 2007.

The Board concluded that because Wolters' left knee injury was not work related, his back injury—which allegedly resulted from an antalgic gait caused by problems with his knee—was also not work related. The Board also relied on Dr. Ebelke's opinion that Wolters had benign, non-work-related low back pain as well as the opinions of Drs. Shemesh, Ebelke, and Clymer that Wolters had no permanent functional impairment of his back. The Board also found Wolters' failure to report that he had previously sought medical treatment for low back pain in 1999 to be significant.

The Board, therefore, held that:  (1) Wolters did not sustain a permanent functional impairment of his right ankle; (2) Wolters did not prove by a preponderance of

11

the evidence that he sustained work-related left knee or low back injuries; and (3) Wolters was not entitled to any temporary total disability benefits for the alleged left knee and low back injuries. Accordingly, the Board modified the ALJ's award, finding Wolters was entitled to payment of all authorized medical bills associated with his right ankle and any future medical treatment for his right ankle upon application and approval by the Director. The Board also awarded unauthorized medical up to $500 but found that Wolters was not entitled to permanent partial disability or temporary total disability payments for his left knee or low back.

Subsequently, Wolters timely filed a petition for review with this court.

ANALYSIS

Final orders of the Board are subject to review under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq*. K.S.A. 2014 Supp. 44-556(a). The standard of judicial review under the KJRA varies, depending upon the issue raised. See K.S.A. 2014 Supp. 77-621. Wolters raises two issues on appeal:  (1) he argues that the Board erroneously interpreted or applied the law; and (2) he argues that the Board's action was based on a determination of fact that is unsupported by substantial competent evidence in light of the record as a whole. See K.S.A. 2014 Supp. 77-621(c)(4) and (c)(7).

When an appellant alleges the Board erroneously applied the law, we exercise de novo review. See *Craig v. Val Energy, Inc*., 47 Kan. App. 2d 164, 166, 274 P.3d 650 (2012), *rev. denied* 297 Kan. 1244 (2013); K.S.A. 2014 Supp. 77-621(c)(4) (stating that appellate court has authority to grant relief if agency has erroneously interpreted or applied the law). Additionally, we have unlimited review of issues involving the interpretation of a statute. See *Ft. Hays St. Univ. v. University Ch*., *Am. Ass'n. of Univ. Profs*., 290 Kan. 446, 457, 228 P.3d 403 (2010).

12

In workers compensation cases, the statute in effect at the time of the claimant's injury governs the rights and obligations of the parties. See *Bryant v. Midwest Staff Solutions, Inc.*, 292 Kan. 585, 588, 257 P.3d 255 (2011). Accordingly, we must apply the statutes that were in effect on February 2, 2008. But the KJRA provisions in effect at the time of the agency action control the standard of review, so we apply the provisions of the KJRA in effect on November 25, 2014. K.S.A. 2014 Supp. 77-621(a)(2); *Redd v. Kansas Truck Center*, 291 Kan. 176, 183, 239 P.3d 66 (2010).

Wolters' first argument is that the Board misinterpreted and/or misapplied K.S.A. 44-520 because the statute only requires an employee to give the employer notice of the accident within 10 days; it does not require the employee to specify the injuries arising out of that accident. As effective on February 2, 2008, K.S.A. 44-520 stated:

> "[P]roceedings for compensation under the workers compensation act shall not be maintainable unless notice of the accident, stating the time and place and particulars thereof, and the name and address of the person injured, is given to the employer within 10 days after the date of the accident, except that actual knowledge of the accident by the employer or the employer's duly authorized agent shall render the giving of such notice unnecessary. The ten-day notice provided in this section shall not bar any proceeding for compensation under the workers compensation act if the claimant shows that a failure to notify under this section was due to just cause . . . ."

We find that Wolters' argument that the Board misapplied this statue to be unpersuasive because the Board did not reject Wolters' claim for failure to provide notice of the accident. Instead, the Board relied on the absence within the notice of any mention of a left knee injury as one factor in weighing the conflicting evidence presented to it regarding when this injury was actually suffered. Thus, the Board did not misinterpret or misapply K.S.A. 44-520.

Next, Wolters argues that the Board violated K.S.A. 44-557(b) by considering Form A-1, Employer's Report of Accident. We find that this statute is not applicable to this case, nor did the Board violate it. See *Bearce v. United Methodist Homes*, No. 97,879, 2007 WL 4105377 (Kan. App. 2007) (unpublished opinion) (finding K.S.A. 44-557[b] inapplicable because the claimant did not die). Regardless, Wolters withdraws this argument in his reply brief.

The rest of Wolters' argument goes to the sufficiency of the evidence supporting the Board's decision. Nevertheless, Wolters argues in his reply brief that the Board misinterpreted and misapplied the law regarding the secondary injury rule because a review of the record as a whole shows that there was sufficient evidence to support its application to his back injury. However, a review of the record reveals that the Board did not misinterpret the secondary injury rule but simply found that it did not apply to the facts of this case. We, conclude, therefore that Wolters has not shown that the Board erroneously interpreted or applied the law.

Turning to the issue of whether there is sufficient competent evidence to support the Board's factual findings, we must review the record as a whole to determine whether the findings are supported by substantial evidence. See K.S.A. 2014 Supp. 77-621(c)(7). In undertaking this analysis, we note:

> "'[I]n light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the

14

record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 2014 Supp. 77-621(d).

It is important to note that we do not weigh the evidence except to determine whether the evidence supporting the Board's decision has been so undermined by conflicting evidence that we no longer have confidence that the evidence is substantial. *Herrera-Gallegos v. H & H Delivery Service, Inc*., 42 Kan. App. 2d 360, 363, 212 P.3d 239 (2009). The term "substantial evidence" is not statutorily defined. Nevertheless, the Kansas Supreme Court has found that it refers to evidence possessing something of substance and relevant consequence, which induces the conclusion that the award was proper and furnishes a basis of fact from which the issue raised easily could be resolved. *Saylor v. Westar Energy, Inc*., 292 Kan. 610, 614, 256 P.3d 828 (2011).

Claimants in a worker's compensation case have the burden of proof to establish their right to an award of compensation under the Workers Compensation Act and to prove the various conditions on which their right depends. K.S.A. 2007 Supp. 44-501(a). "'Burden of proof' means the burden of a party to persuade the trier of facts by a preponderance of the credible evidence that such party's position on an issue is more probably true than not true on the basis of the whole record." K.S.A. 2007 Supp. 44-508(g). Once a claimant has met the burden of proving a right to compensation, the employer has the burden of proving relief from that liability based on any statutory defense or exception. *Foos v. Terminix*, 277 Kan. 687, 693, 89 P.3d 546 (2004).

We note that although Wolters argues that the Board's decision is unsupported by substantial competent evidence because his initial report should not have been considered as evidence, he abandons this argument in his reply brief. Instead, Wolters contends that the record viewed as a whole refutes the Board's findings of fact. On appeal, he emphasizes the fact that although the City initially declined to pay his medical bills from Dr. Miller, it eventually determined that he made a timely notice of the injury and that his

15

claim was compensable. But he cites only his own testimony from the hearing before the ALJ to support this allegation, and he does not state how this initial payout is based on the same legal theory necessary to meet his burden of proving that he suffered a work-related injury.

The City argues that it had the right to voluntarily pay Wolters' medical bills without waiving its ability to eventually have someone determine whether the claims were actually compensable. See K.S.A. 44-534a (stating that benefits paid by the employer or insurance carrier voluntarily are to be reimbursed if the compensation was in excess of the amount of compensation the employee is entitled). In his reply brief, Wolters takes his argument a step further by maintaining that the City authorized medical treatment that actually made his condition worse. Specifically, he argues that the City must be found liable for the injury to his femoral nerve that evidently occurred during the surgery on his left knee. Wolters, however, cites no authority to support these contentions, so they are deemed abandoned. See *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013) (stating that failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority is akin to failing to brief the issue). Furthermore, Wolters claims that the Board's decision was erroneous because there is no other explanation offered for his left knee injury. However, Dr. Clymer's opinion was that although the problems in Wolters' knee could have been caused by a traumatic injury, such injuries were usually caused by wear, tear, and degeneration.

This case required the Board to weigh conflicting evidence regarding when Wolters first began to have left knee pain and whether his knee injury was caused by his fall on February 2, 2008. The Board's finding that Wolters did not tell the physician assistant he saw the day of the fall that his knee was in pain is supported by substantial competent evidence. It is only Wolters' own testimony that contains evidence of knee pain prior to October 2008. It was not until after he had filed his application for hearing

16

with the division of workers compensation that he began telling physicians that he had had immediate problems with his knee beginning on February 2, 2008.

Accordingly, we find that a review of the record as a whole reveals that although a reasonable person may have ruled in Wolters' favor, it is not significant enough to undermine our confidence that the Board's findings were supported by substantial evidence. The Board viewed all of this evidence and made a reasonable determination. Although disputed, there is evidence in the record to support a finding that Wolters had initially told health care providers that he had injured his ankle during the fall. There is also evidence to support a finding that his left knee did not start causing him trouble until approximately 8 months after his fall. Thus, we conclude that the Board's determination that Wolters' left knee injury was not caused by the fall in February 2008 is supported by substantial competent evidence, and we will not replace our judgment for that of the Board. Furthermore, because the Board determined that the left knee injury was not compensable, it was reasonable to conclude that his back problems were also not caused by the fall.

Viewing the record as a whole, we conclude that there is substantial competent evidence in the record to support the Board's findings and conclusions.

Affirmed.